**Nester and LaVain M. ELLWEIN,**
**Plaintiffs,**

v.

**UNITED STATES of America,**
**Defendant.**

**Civ. No. A2–81–188.**

United States District Court,
D. North Dakota,
Northeastern Division.

Dec. 30, 1983.

Garry Pearson, Pearson & Christensen, Grand Forks, N.D., for plaintiffs.

Lawrence E. Meuwissen, Trial Atty., Tax Div., Dept. of Justice, Washington, D.C.,

Rodney Webb, U.S. Atty., Fargo, N.D., for defendant.

## MEMORANDUM AND ORDER

BENSON, Chief Judge.

The Ellweins brought this lawsuit for a refund of income taxes assessed against and paid by them for the year 1979. The first issue presented is whether expenses incurred for transportation, food, and lodging by the husband taxpayer, while working as a boilermaker in the construction of power plants in central North Dakota, are deductible. The taxpayers claim these expenses are deductible under section 162 of the Internal Revenue Code of 1954 as ordinary and necessary business expenses. Deductibility of these expenses depends on whether Nester Ellwein's prospects for continued employment in the area and at particular job sites were temporary, rather than indefinite. The second issue is whether the taxpayers properly substantiated any allowable expenses.

## I. BACKGROUND FACTS

### A. Nester Ellwein's Work History

Nester Ellwein is the primary plaintiff in this case, and his wife LaVain joins him in this lawsuit solely because they filed a joint income tax return for 1979.

Since the early 1970's, when Nester became employed as a construction worker at the ABM missile facility at Nekoma, North Dakota, the Ellweins have maintained a home in Lakota, North Dakota. Between 1973 and 1978 Chicago Bridge & Iron employed Nester as a boilermaker through a referral from the boilermakers' union in Minneapolis, Minnesota. Nester's work with Chicago Bridge caused him to work at several locations in the United States including: Hillsboro and Velva, North Dakota; East Grand Forks, Virginia, and Waseca, Minnesota; and Council Bluffs, Iowa. All of these jobs were of short duration except for the work in Hillsboro, North Dakota.

In the fall of 1978 Chicago Bridge laid Nester off, and he filed with the boilermakers' union in Minneapolis, Minnesota. The union placed Nester's name on a list of workers seeking jobs. When his name came to the top of the list, the union referred Nester to a job with Combustion Engineering at the Coal Creek Plant near Falkirk, North Dakota. This plant was one of the immense coal-fired electrical generating plants then under construction in central North Dakota. These power plants are clustered between Mandan on the south and Hazen-Beulah-Underwood on the north. Nester's job at the Coal Creek Plant lasted from early fall of 1978 until June 29, 1979, a period of seven or eight months.

Within a week after the lay-off the boilermakers' union referred Nester, through the union ladder, to a job with Babcock & Wilcox at the Coyote Plant under construction near Beulah. Nester worked there for six weeks until he became ill and had to leave the job. In the late fall of 1979 Nester recovered from his illness, and the union referred him to a job with Combustion Engineering at the Antelope Valley Plant North of Beulah. He worked there until illness again forced him to quit in June of 1980.

Nester took over a year to recover from his illness. By July 1981 Dresser Engineering employed Nester in a non-union job at Trenton, North Dakota. This job lasted six weeks. Then the union referred Nester to a job with the James Edward Company at the Mandan refinery, which lasted two weeks. Nester was out of work over the winter of 1981–82. In April 1982 Combustion Engineering hired Nester, through the union referral process, to work at the Antelope Valley Plant North of Beulah. He worked there continuously until January 1983. After a couple months of unemployment, the union referred Nester to a job with Riley-Stoker at the ANG coal gasification plant north of Beulah. Riley-Stoker laid him off on June 22, 1983, and, as of the date of trial, Nester has not been employed.

### B. The Ellweins' Living Arrangements

During 1979 Nester stayed in a trailer home that he moved to Pick City, North Dakota, in the fall of 1978. Pick City is roughly midway between Beulah and Underwood, in an area where several power plants were under construction in 1979. The trailer home has remained in the area for Nester's use since the fall of 1978.

LaVain Ellwein continued to live in their home in Lakota, where she was employed. During 1979, the tax year in issue, the taxpayers' son graduated from high school and secured employment at one of the projects in the Beulah area. He lived with Nester in the trailer home for approximately the last six months of 1979 and ate his meals there. LaVain and other members of their family occasionally visited Nester and stayed in the trailer home.

Most weekends in 1979 Nester travelled to Lakota to see his family, and he incurred mileage expenses in doing so. He paid rent for the parking space for his trailer, paid electrical bills, paid water fees, and drove his car between Pick City and the job site each working day. Nester ate breakfast and supper in his trailer and packed lunch each morning to take to the job site. On weekends LaVain purchased groceries in Lakota for Nester to take to Pick City.

Nester had not used the trailer home as a temporary residence before 1978, when he moved it to Pick City. His work before that time had taken him away from home for various periods of time, but the Ellweins had used the trailer solely as rental property prior to the fall of 1978.

### C. Boilermakers' Prospects for Work in 1979

#### 1. Work in Central North Dakota

Nester moved his trailer to Pick City from Lakota in the fall of 1978 when he was hired as a boilermaker at one of several power plants under construction in the area near Pick City. At that time the need for boilermakers in construction of Coal Creek, near Falkirk, North Dakota, had peaked and was gradually declining. Construction of another power plant just south of Beulah, the Coyote Station, had begun in the fall of 1977, and the number of boilermakers on the job there was steadily increasing in late 1978 and early 1979. Construction of a third power plant, the Antelope Valley Station, began in mid-1978 just north of Beulah. The number of boilermakers employed at that plant was also steadily increasing during 1979. The ANG coal gasification plant north of Beulah was in the planning stage as early as June 1977, and actual construction on the ANG plant commenced in July of 1980.

Professor T. Larry Leistritz, an agricultural economist from North Dakota State University, testified for the Government as an expert witness. In 1975 he had conducted surveys of construction force personnel then employed at power plant construction projects in central North Dakota. The Leland Olds Station at Stanton, North Dakota, and the Square Butte Plant near Washburn, North Dakota, were already under construction at that time. The Coal Creek Station at Underwood had also commenced construction in 1975. Dr. Leistritz testified there was considerable optimism among the construction work force for the possibilities of further employment in the area. Considering the size and number of the projects under construction or planned over the course of 1975 to 1978, Dr. Leistritz testified that the prospects for continuing employment in central North Dakota in the construction industry as a whole were very good in 1975.

In addition, Dr. Leistritz reviewed plans for construction of other central North Dakota power plants, including specifications and schedules for the various phases of construction. Based on this review and his experience and knowledge in impact assessment of large construction projects, Dr. Leistritz expressed the opinion that the prospects for continuing employment for boilermakers in central North Dakota were very good in 1978.

David Funston, a representative of the iron workers' union, testified that information concerning the plans, scope, financing, and scheduling of the power plant projects

was generally available to boilermakers at the union halls through various trade publications.

### 2. The Job Referral Process

Contractors or subcontractors hire boilermakers by contacting the union hall and stating the number of workers and skills required for a particular job. The union supplies workers on the basis of a "ladder list." A laid-off union worker files with the union and waits until his name comes to the top of the list for a job referral. A worker must take a referral that he qualifies for regardless of location, or he goes to the bottom of the list.

Nester Ellwein testified that he didn't have trouble getting employment in central North Dakota after a lay-off or spell of illness. Even though he had to go back through the union hiring ladder, Nester testified there was not much time between jobs in central North Dakota.

Eugene Johnson, the Senior Construction Manager of Combustion Engineering, testified that union workers from distant places often wanted assurances as to how long a job would last before taking a referral to central North Dakota, because it would expose them to travelling long distances. Eugene Johnson testified that the only guarantee he ever made was that he would hire them when they got to the plant. This lack of assurances as to job duration could have had the effect of leaving more central North Dakota jobs open for union members who already lived in central North Dakota, and reducing the time for North Dakota workers to wait on the union ladder for a central North Dakota job.

Bob Schock, a representative of the boilermakers' union testified there are various levels of skill involved in boilermakers' work. There are about twenty welding tests a boilermaker may take to qualify for more jobs. If a boilermaker has a number of skills and works efficiently, he has a better chance of staying on a job longer than workers with lesser skills. Nester Ellwein had only taken and passed three skill tests. These three tests involved flat or plate welding, and thus, Nester was a boilermaker of average skills.

### 3. Duration of Boilermakers' Employment at a Particular Job Site

The taxpayers called three witnesses to establish the demand for boilermakers and the duration of their employment. Eugene Johnson, the Senior Construction Manager of Combustion Engineering, testified that he hires workers as needed in the various stages of construction. Eugene Johnson only guarantees one day's pay when he hires boilermakers.

David Funston, a labor official with the iron workers' union, testified that the longest period of time a non-foreman boilermaker could expect to keep a job was between four and five months, although if he was fortunate he might work for as long as nine months. Funston testified that workers are laid off if materials or equipment are not at the job site at the proper time in the construction schedule, or if there are changes in environmental requirements or permit requirements.

Bob Schock, a boilermaker, testified that different stages of construction require boilermakers with different skills, and boilermakers without the skill required for a certain stage of production are laid off. Bob Schock also testified that the nature of a boilermaker's work is dependent upon shipping delays, changes in scheduled stages of construction, and weather conditions.

Boilermakers can be laid off for a variety of reasons, including the demand for various numbers of workers at different stages of construction; the demand for workers possessing specialized skills at certain stages, and the lack of demand for such a skill once that phase of the work is done; delays in the scheduling of construction; decreases in demand for electricity output; new O.S.H.A. or environmental requirements; the failure of a workman to pass his six month skills evaluation; or even the delay in construction or mothballing of projects due to anticipated revenue shortfalls.

### D.  The Ellweins' Claimed Deductions

The Ellweins introduced into evidence at trial their checks for the trailer lot rental, the electric and water bills for the trailer, and groceries.  On their return for 1979 the Ellweins claimed all of these expenses along with Nester's daily round trip mileage from his trailer in Pick City to his job sites and his weekly round trip mileage from Pick City to Lakota.

The Internal Revenue Service disallowed the Ellweins' deductions and stated, "The travel expenses you claimed were incurred in a location where you were working for an *indefinite* period.  Since that location is your TAX *home,* the expenses incurred are not deductible."

The Ellweins paid the taxes assessed for 1979, filed a claim for a refund, and brought this action more than six months later.

## II.  DEDUCTIBILITY

Section 162 of the Internal Revenue Code of 1954 controls the deductibility of the expenses incurred by Nester Ellwein.  Section 162 provides in pertinent part:

> (a) There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including—
>
> \*      \*      \*      \*      \*      \*
>
> (2) travelling expenses (including amounts expended for meals and lodging other than amounts which are lavish or extravagant under the circumstances) while away from home in the pursuit of a trade or business;  ...

26 U.S.C. § 162 (1954).

There are two separate issues concerning the Ellweins' deductions under section 162.  First, the court must determine whether Nester's lodging expenses, food, and mileage expenses for round trips between Pick City and *Lakota* on weekends are deductible under section 162(a)(2), as "away from home" business expenses.  This involves a determination of whether Nester's "home" is in Pick City or Lakota for purposes of section 162.  A tax "home" is the taxpayer's abode located in the vicinity of a taxpayer's regular or principal place of employment, or in the vicinity where he is employed for an indefinite rather than temporary time period.  Second, the court must determine whether Nester's daily round trip mileage expenses between Pick City and his *job sites* are deductible under section 162(a).  Mileage expenses between a person's job and home become deductible business expenses under section 162(a), rather than nondeductible personal expenses, only if the taxpayer's prospects for employment at the job site are temporary rather than indefinite.

### A.  Away from Home Expenses

The taxpayers first claim Nester's expenses are deductible as "away from home" expenses under section 162(a)(2).  The Supreme Court has held that three requirements must be met before a deduction of unreimbursed travel expenses will be allowed under section 162(a)(2):  (1) the expenses must be reasonable and necessary;  (2) they must be incurred while the taxpayer is "away from home;"  and (3) they must be incurred while in the pursuit of a trade or business.  *Commissioner v. Flowers,* 326 U.S. 465, 66 S.Ct. 250, 90 L.Ed. 203 (1946).

The requirement at issue in this case is the "away from home" requirement.  The taxpayers allege Nester's home for purposes of section 162(a)(2) is Lakota, North Dakota.  The Government alleges Nester's home for tax purposes is in central North Dakota.  Pick City, North Dakota, is where Nester moved his trailer home in 1978 to be able to live near the power plant work in central North Dakota, and the trailer has remained in that area for the last five years.

■  A taxpayer's "home" for purposes of section 162(a)(2) is generally considered to be located at (1) the taxpayer's regular or principal, if there is more than one regular, place of business, or (2) if the taxpayer has no regular or principal place of business, then at the taxpayer's regular place

of abode in a real and substantial sense. Rev.Rul. 83–82, citing Rev.Rul. 73–529 and Rev.Rul. 60–189; *Jenkins v. Commissioner*, 418 F.2d 1292, 1293 (8th Cir.1969).

■ A taxpayer may be "away from home" when on a temporary as opposed to an indefinite or permanent, work assignment away from the taxpayer's regular or principal place of employment. *Peurifoy v. Commissioner*, 358 U.S. 59, 79 S.Ct. 104, 3 L.Ed.2d 30 (1958). Employment is temporary for this purpose only if its termination can be foreseen within a reasonably short period of time. *Id.*

The Internal Revenue's position, as stated in a recent revenue ruling, is that when a taxpayer anticipates employment to last for less than one year, whether such employment is temporary will be determined on the basis of the facts and circumstances of the case. Rev.Rul. 83–82. If a taxpayer anticipates employment to last for one year or more, and the employment does last for a year or more, there is a rebuttable presumption that the employment is indefinite rather than temporary. Rev.Rul. 83–82, citing Rev.Rul. 60–189. This presumption of indefiniteness may be rebutted when the employment is expected to, and actually does, last for one year or more, but less than two years. Rev.Rul. 83–82. The Internal Revenue Service considers an expected or actual stay of two years or longer to be an indefinite stay and not a stay away from home, regardless of any other facts or circumstances in the case. Rev. Rul. 83–82.

The Internal Revenue Service has stated, "[I]f a construction worker regularly lives and makes his employment contacts in City A but regularly works in City B, for example, his 'home' in the present [travelling expense] context is in City B, not City A." Rev.Rul. 60–189. Courts have generally considered a person's "home" for tax purposes to be the place where the taxpayer has his principal place of duty, and where he has an abode while pursuing such duty, not where he merely claims his residence to be. *Cockrell v. Commissioner*, 321 F.2d 504, 507 (8th Cir.1963).

■ In the Ellweins' case, Nester has had his principal place of duty in central North Dakota for the last five years. He moved his trailer home to Pick City in the fall of 1978 because the construction of several power plants in the area meant prospects for the employment of boilermakers for an indefinite or substantially long period of time. Pick City was his regular or principal place of business for the tax year 1979, because his work from the fall of 1978 through 1979, and in fact through the time of trial, was in the vicinity of Pick City, rather than Lakota.

The Internal Revenue Service considers employment or a stay at a particular location of more than two years to be indefinite. Rev.Ruling 83–82. Nester's trailer remained in central North Dakota from 1978 to 1983 for his use during employment in that area. He has not been employed in the vicinity of Lakota for the past five years, and the maintenance of a home in Lakota has been purely for personal reasons. When Nester moved his trailer to Pick City in 1978 he had prospects for work in the area for an indefinite or substantially long period of time, and he in fact worked in the area for a substantially long period.

This court finds Nester's tax "home" in 1979 for purposes of section 162(a)(2) to be Pick City, North Dakota. Thus, his expenses for lodging in Pick City, travel to Lakota from Pick City on weekends, and his groceries are not deductible as "away from home" expenses under section 162(a)(2).

### B. Travel Expenses to Job Sites from Pick City

■ Deductibility under section 162(a)(2) generally requires a stay away from home for a period of time that necessitates rest or overnight sleep. *United States v. Tauferner*, 407 F.2d 243 (8th Cir.), *cert. denied*, 396 U.S. 824, 90 S.Ct. 66, 24 L.Ed.2d 74 (1969). Thus, the cost of daily travel from a taxpayer's residence to work and return is generally a nondeductible personal expenditure. *Commissioner v. Flowers*, 326 U.S. 465, 66 S.Ct. 250, 90 L.Ed. 203 (1945).

An exception to this rule is when the taxpayer's employment at the job site is temporary rather than indefinite or indeterminate. *Boone v. United States*, 482 F.2d 417, 419 (5th Cir.1973).

■■ Costs of travelling back and forth to work are deductible only if they qualify as ordinary and necessary business expenses under section 162(a). *Frederick v. United States*, 603 F.2d 1292, 1293–94 (8th Cir.1979). Unless the taxpayer's prospects for continued employment at the job site are temporary, rather than indefinite, the commuting expenses are not deductible because they constitute personal expenses. *Id.* at 1294, citing 26 U.S.C. § 262. The *Frederick* case involved a claim for the deduction of the costs of travelling back and forth to work from the taxpayer's home, rather than a claim for lodging, meals, and other travel expenses properly deductible as "away from Home" expenses under section 162(a)(2).

■■ A temporary employment is one that is foreseeably for a short period of time or for a fixed duration. *Boone*, 482 F.2d at 419; *Frederick*, 603 F.2d at 1294. An indefinite or indeterminate employment is one in which the prospect is that the work will continue for an indeterminate or substantially long period of time. *Cockrell v. Commissioner*, 321 F.2d 504 (8th Cir. 1963); *Frederick*, 603 F.2d at 1294.

■ This court finds that although Nester's job prospects in the area around Pick City in 1979 were indefinite rather than temporary, Nester's expectations as to the length of work at particular job sites for particular employers were that the work would be temporary. Boilermakers, such as Nester, could be laid off at any time from a particular job assignment. Because of the uncertainty as to the demand for production of electricity and the effect of world oil prices on anticipated revenues, there was no assurance that a power plant would follow its proposed construction schedule or even be completed. Since different stages of construction required boilermakers with different skills, layoffs were common and the demand for boilermakers of various skills changed between stages.

Shipping delays, changes in scheduled stages of production, and weather conditions could also cause lay-offs of boilermakers.

Boilermakers were not guaranteed more than a day's pay when they were hired on a particular assignment. A good boilermaker could not reasonably expect a job for more than a period of four to five months, perhaps nine or ten months if he was fortunate. Nester's actual employment periods for his separate work assignments at the various power plants establish that his employment actually was of short duration, although Nester's illnesses were the reason for termination in some of the jobs.

Therefore, this court finds that Nester's prospects for employment as a boilermaker at the separate work assignments in various central North Dakota power plants were for temporary employment. To the extent unreimbursed travel expenses for Nester's daily trips between his job sites and Pick City are substantiated, they are deductible.

## III. UNREIMBURSED AND SUBSTANTIATED TRAVEL EXPENSES BETWEEN PICK CITY AND THE JOB SITES

The only travel expenses that are deductible, if substantiated, are Nester's unreimbursed travel expenses between Pick City and his daily work sites. The taxpayers, Nester and LaVain Ellwein, testified that Nester drove from Pick City to the job sites every work day.

The taxpayers allege the distance from Pick City to Coal Creek is 25 miles one way, and Nester worked there for 129 days between January 1979 and June 29, 1979. The taxpayers allege Nester made 31 round trips in 1979 to Coyote Station, which is 39 miles from Pick City. The distance from Pick City to Antelope Valley is 45 miles, and Nester made 11 such trips in 1979. Accordingly, Nester traveled 6,450 miles between Coal Creek and Pick City, 2,418 miles between Coyote and Pick City, and 990 miles between Antelope Valley and Pick City.

Only unreimbursed travel expenses are deductible under section 162. Nester's deposition and his W–2 Wage and Tax Statement for 1979 indicate that Combustion Engineering reimbursed Nester for travel expenses in the amount of $1,929.66. Combustion Engineering was Nester's employer at Coal Creek and Antelope Valley in 1979. By applying the 18.5¢ per mile statutory deduction that the taxpayers have used, Nester would have a total of $1,376.40 for travel expenses between Pick City and the job sites where he was employed by Combustion Engineering. Since Combustion Engineering reimbursed Nester in an amount exceeding $1,376.40, his travel expenses while working for Combustion Engineering in 1979 are not deductible.

Applying the 18.5¢ per mile figure, Nester has a total of $447.33 unreimbursed mileage expenses for travel from Pick City to his job site at the Coyote Station while working for Babcock & Wilcox. The taxpayers must substantiate this amount.

The substantiation requirements for travel expenses are provided in section 274(d) of the Internal Revenue Code:

No deduction shall be allowed—(1) under section 162 or 212 for any travelling expenses (including meals and lodging while away from home),

\* \* \* \* \* \*

unless the taxpayer substantiates by adequate records or by sufficient evidence corroborating his own statement (A) the amount of such expense or other item, (B) the time and place of travel ..., [and] (C) the business purpose of the expense or other item ...

26 U.S.C. § 274(d) (1978).

This court received in evidence at trial Nester's W–2 wage and tax statement from his employment in 1979 at Babcock & Wilcox. This evidence corroborates his testimony that he worked for Babcock & Wilcox, but it does not show the number of days employed there. The Government has not questioned the duration of his employment for Babcock & Wilcox, and this court has no reason to believe the evidence to be incorrect.

Nester testified in court as to the mileage between his trailer at Pick City and the Coyote Station where Babcock & Wilcox employed him. The court received in evidence a map of North Dakota with some mileage figures. The Government has not challenged the mileage figures testified to by Nester, and this court finds them to be sufficiently substantiated.

Therefore, this court finds the taxpayers have met the substantiation requirements of section 274, and concludes the unreimbursed travel expenses between Pick City and the Coyote Station are deductible.

## CONCLUSION AND ORDER FOR JUDGMENT

The holding of the court is that Nester Ellwein's tax home in 1979 for purposes of 26 U.S.C. § 162(a)(2) was Pick City, North Dakota. The expenses of his travel between Lakota and Pick City and his lodging and subsistence expenses while at Pick City are not deductible. His employment at the separate work assignments in the central North Dakota area was temporary and his unreimbursed travel expenses from his tax home in Pick City to his employment sites are deductible. While employed by Combustion Engineering, the taxpayer incurred $1,376.40 in travel expenses for which he was reimbursed in the amount of $1,929.66. While employed by Babcock & Wilcox he incurred $447.33 travel expenses for which he was not reimbursed.

IT IS ORDERED that judgment be entered accordingly and that the defendant United States, through its agency Internal Revenue Service, administratively make the appropriate adjustments in the 1979 tax liability of plaintiffs Nester Ellwein and LaVain M. Ellwein.